JOYCE M. DANIEL, Plaintiff v. CAROLINA SUNROCK CORPORATION, a North Carolina Corporation, and BRYAN PFOHL, Individually, Defendants

No. 929SC479

(Filed 1 June 1993)

1. **Labor and Employment § 77 (NCI4th) — wrongful discharge — public policy exception — sufficient forecast of evidence**

Plaintiff's forecast of evidence was sufficient to support her claim for wrongful discharge under the public policy exception to the employment-at-will doctrine where plaintiff presented evidence tending to show that her working conditions deteriorated after she was subpoenaed and expressed a willingness to testify honestly about her employer in a former co-employee's suit against the employer, although she never testified because the lawsuit for which she was subpoenaed was settled out of court; the employer's president told plaintiff not to say any more than she had to when testifying and to "remember that you work for me and represent me and my company"; after plaintiff told the employer's attorney that she intended to testify that her former co-employee was a good worker, the employer took away many of plaintiff's employment responsibilities and moved her to a smaller office with no phone, no typewriter, and no heat; the employer's president told another employee that plaintiff knew too much and stated an intention to get rid of all of the former co-employee's "people"; other employees took notes on plaintiff's activities, counted and screened her personal phone calls, had a key made and inspected the contents of plaintiff's desk while she attended her father's funeral, and made harassing phone calls to the homes of plaintiff, her mother and her sister-in-law; and plaintiff was discharged thirteen months after the former co-employee's case was settled. A reasonable finder of fact could infer from plaintiff's forecast of evidence that the employer's president engineered plaintiff's discharge because he believed she was prepared to testify truthfully as a witness in the former co-employee's lawsuit.

**Am Jur 2d, Master and Servant §§ 49-59.**

**DANIEL v. CAROLINA SUNROCK CORP.**

[110 N.C. App. 376 (1993)]

**2. Trespass § 2 (NCI3d)— intentional infliction of emotional distress—insufficient forecast of evidence**

Alleged actions by defendant employer and its president did not rise to the level of extreme and outrageous conduct so as to support plaintiff's claim for the intentional infliction of emotional distress where plaintiff's forecast of evidence tended to show that, after plaintiff was subpoenaed by a former co-worker to testify against defendant employer, defendant's employees took away many of plaintiff's employment responsibilities, took notes on plaintiff's activities, counted and screened plaintiff's personal phone calls, had a key made and inspected the contents of plaintiff's desk while she attended her father's funeral, moved plaintiff into a smaller office with no phone and no heat, and made harassing phone calls to the homes of plaintiff, her mother, and her sister-in-law.

**Am Jur 2d, Trial § 770.**

Judge LEWIS dissenting.

Appeal by plaintiff from judgment entered 30 January 1992 in Granville County Superior Court by Judge Robert H. Hobgood. Heard in the Court of Appeals 15 April 1993.

On 17 July 1990, plaintiff filed a complaint in which she asserted claims against defendants for wrongful discharge, breach of employment contract, and tortious interference with contract. On 21 February 1991, plaintiff filed an amendment to the complaint, adding a claim for the intentional infliction of emotional distress. On 1 October 1990, defendants filed an answer to plaintiff's original complaint, and on 12 April 1991, defendants filed an answer to plaintiff's amended complaint.

Following extensive discovery proceedings, on 16 January 1992, defendants filed a motion for summary judgment as to each of plaintiff's claims. On 11 February 1992, plaintiff took a voluntary dismissal of her breach of employment contract claim. On that same date, Judge Hobgood entered summary judgment for the defendants on plaintiff's claims of wrongful discharge, intentional infliction of emotional distress, and tortious interference with contract. Plaintiff filed notice of appeal on 24 February 1992.

*Pulley, Watson & King, P.A., by Tracy Kenyon Lischer, for plaintiff-appellant.*

*Haynsworth, Baldwin, Johnson & Greaves, P.A., by Gregory P. McGuire, for defendant-appellees.*

WELLS, Judge.

Plaintiff contends that the trial court erred in granting defendants' motion for summary judgment on plaintiff's claims of wrongful discharge and intentional infliction of emotional distress. Plaintiff did not appeal the summary judgment order as to her tortious interference with contract claim.

"Summary judgment is properly granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.' N.C.G.S. 1A-1, Rule 56(c) (1983)." *Waddle v. Sparks,* 331 N.C. 73, 414 S.E.2d 22 (1992). All inferences of fact from the proofs offered must be drawn against the movant and in favor of the party opposing the motion for summary judgment. *Id.* Applying these guidelines, we shall consider plaintiff's claims for wrongful discharge and intentional infliction of emotional distress.

## Wrongful Discharge

While employed at Sunrock, plaintiff was an employee-at-will. Generally, in North Carolina, an employee-at-will has no claim for relief for wrongful discharge. *Tompkins v. Allen,* 107 N.C. App. 620, 421 S.E.2d 176 (1992). Generally, either party to an employment-at-will contract can terminate the contract for no reason at all, or for an arbitrary or irrational reason. *Id.* However, a valid claim for wrongful discharge may exist in the employment-at-will context if the contract is terminated for an unlawful reason or a purpose that contravenes public policy. *Coman v. Thomas Manufacturing Co.,* 325 N.C. 172, 381 S.E.2d 445 (1989).

In *Sides v. Duke University,* 74 N.C. App. 331, 328 S.E.2d 818, *disc. rev. denied,* 314 N.C. 331, 335 S.E.2d 13 (1985), this Court recognized a public policy exception to the employment-at-will doctrine in a case where a nurse alleged that her employer pressured her not to testify honestly in a medical malpractice lawsuit and subsequently discharged her because she refused to commit perjury, but rather testified fully and honestly. This Court wrote:

DANIEL v. CAROLINA SUNROCK CORP.

[110 N.C. App. 376 (1993)]

Thus, while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. . . . We hold, therefore, that no employer in this State, notwithstanding that an employment is at will, has the right to discharge an employee and deprive him of his livelihood without civil liability because he refuses to testify untruthfully or incompletely in a court case, as plaintiff alleges happened here.

In *Williams v. Hillhaven Corp.*, 91 N.C. App. 35, 370 S.E.2d 423 (1988), following *Sides*, this Court expanded the same public policy exception to a case where the plaintiff did not allege that her employer pressured her to alter her testimony, but rather alleged that she was wrongfully discharged after honestly testifying in an unemployment compensation hearing. The defendants in *Williams* attempted to differentiate their case from *Sides* because they never harassed or threatened plaintiff before she testified, but rather allegedly harassed and fired her after she testified against them. The *Williams* Court disagreed and found that, because she was discharged for telling the truth, "plaintiff falls into the same narrow exception to the general rule . . . that *Sides* created."

[1] In the case at bar, plaintiff asks this Court to extend the public policy exception to the employment-at-will doctrine recognized in *Sides* and *Williams* to a situation where plaintiff alleges that she was wrongfully discharged after being subpoenaed and expressing a willingness to honestly testify about her employer, but never actually testified because the lawsuit for which she was subpoenaed was settled out of court.

At the summary judgment hearing, the trial court considered (in addition to the pleadings) the depositions of plaintiff, H. Braxton Davis, Jr., David A. Eckstine, Jessie Self, Donald Tilley, Ellen Wilkins, and defendant Pfohl, and various exhibits relating to the plaintiff's employment history. From these materials, the forecast of evidence, viewed in the light most favorable to plaintiff, may be summarized as follows:

Carolina Sunrock Corporation [Sunrock] operates a quarry in Butner, North Carolina, producing crushed stone and building materials. Defendant Bryan Pfohl is the owner and President of Carolina Sunrock Corporation. Plaintiff became an employee at Sunrock in September of 1985. Between September of 1985 and

January of 1988, plaintiff was an excellent employee and had received favorable reviews from her supervisors, one of whom stated that she was "very very effective" and "did a very good job." On 28 January 1988, plaintiff was subpoenaed to produce company personnel records and to testify on behalf of Bob Gentry, a former plant superintendent who was suing Sunrock on a breach of contract claim. After learning that she had been subpoenaed, plaintiff immediately informed defendant Pfohl, the company's president and owner, that she had been served with the subpoena.

Upon learning of the subpoena, Mr. Pfohl told plaintiff not to say anymore than she had to when testifying and to "remember that you work for me and represent me and my company." Plaintiff took Mr. Pfohl's comments as a threat, pressuring her to alter her testimony, if need be, to advance the company's best interests.

Mr. Pfohl told plaintiff to meet with the company's attorney. At the meeting with Sunrock's attorney, plaintiff informed the attorney that she believed that Bob Gentry was a good worker and intended to testify to that effect. After informing Mr. Pfohl of the subpoena and her intention to testify honestly, plaintiff's working conditions deteriorated significantly. Because she was subpoenaed, Mr. Pfohl became distrustful of plaintiff and believed that she had been leaking company information to Bob Gentry.

Mr. Tilley, a heavy equipment operator, testified in deposition that Mr. Pfohl stated that plaintiff knew too much. Mr. Pfohl also expressed an intention to get rid of all of "Gentry's people." Mr. Pfohl treated plaintiff in a noticeably different manner after she received the subpoena. He was markedly colder to plaintiff after she received the subpoena.

Within one week of plaintiff being served the Gentry subpoena, Ellen Wilkins was hired by Sunrock. Wilkins was assigned many of plaintiff's duties, for reasons unrelated to plaintiff's performance. In February of 1988, Ms. Wilkins began taking notes on plaintiff and reported directly to Mr. Pfohl. Plaintiff was the only employee Ms. Wilkins took notes on and the notes she took were shredded after plaintiff was fired. Mr. Pfohl repeatedly asked Mr. Davis, a supervisor, whether he had "anything on" the plaintiff.

In March of 1988, while plaintiff was away from work, attending her father's funeral, Ms. Wilkins had a key made to plaintiff's

desk on Mr. Pfohl's instructions. In plaintiff's absence, Ms. Wilkins went through plaintiff's desk.

In May of 1988, Bob Gentry's lawsuit against Sunrock was settled out of court; hence, plaintiff never testified.

On 6 June 1988, Jessie Self was hired as a receptionist. Ms. Wilkins told Ms. Self that there were problems with the plaintiff and instructed Ms. Self to keep a record of the number and source of plaintiff's personal phone calls. Plaintiff was the only employee whose phone calls were counted. Ms. Self was also instructed to eavesdrop on plaintiff's conversations with fellow employees and visitors and to keep notes on any violations of company policy by plaintiff. Ms. Self attended secret meetings which Ms. Wilkins called to discuss plaintiff.

In December of 1988, David Eckstine was hired by Sunrock. Mr. Eckstine began taking notes on plaintiff in February, and continued taking such notes until he fired her, at which time he shredded his notes. Plaintiff was the only employee which Mr. Eckstine took notes on.

After plaintiff was subpoenaed and many of her employment responsibilities were stripped, she was moved to a smaller office with no phone, no typewriter, and no heat. On 20 June 1989, Mr. Eckstine met with plaintiff and suggested that plaintiff resign. Plaintiff was told that if she did not resign, she would be terminated. On 20 June 1989, plaintiff was fired.

From this forecast of evidence, a reasonable finder of fact might draw the inference that defendant Pfohl engineered plaintiff's discharge because he believed she was prepared to testify truthfully as a witness in the Gentry lawsuit. If plaintiff was discharged for such reasons, notwithstanding the fact that she never actually testified, then plaintiff's discharge violated public policy and would fall under the public policy exception to the employment-at-will doctrine. Therefore, the trial court erred in granting defendants' motion for summary judgment on the claim of wrongful discharge.

### Intentional Infliction of Emotional Distress

[2] Next, plaintiff contends that the trial court erred in granting defendants' motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress. "The essential elements

of an action for intentional infliction of emotional distress are '1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.' " *Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22 (1992). Extreme and outrageous conduct has been described as conduct which exceeds "all bounds usually tolerated by decent society." *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979).

In the case at bar, plaintiff alleged that harassment by Sunrock's executives and employees constituted extreme and outrageous behavior which was intended to result, and in fact resulted, in her severe emotional distress.

Plaintiff's forecast in support of the "extreme and outrageous behavior" element of her intentional infliction of emotional distress claim included her deposition testimony in which she stated that, after plaintiff was subpoenaed to testify against Sunrock, Sunrock's employees took away many of plaintiff's employment responsibilities, took notes on plaintiff's activities, counted and screened plaintiff's personal phone calls, had a key made and inspected the contents of plaintiff's desk while she attended her father's funeral, moved plaintiff to a smaller office with no phone and no heat, and made harassing phone calls to the home of plaintiff and to the homes of plaintiff's sister-in-law and mother.

In *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, *cert. denied*, 317 N.C. 334, 346 S.E.2d 141 (1986), this Court considered three intentional infliction of emotional distress claims brought against defendant by three former employees. At trial, each plaintiff's emotional distress claim was dismissed by summary judgment. On appeal, each plaintiff argued that her forecast of evidence contained sufficient grounds to overcome a summary judgment motion and reach the jury on its merits. While the Court considering plaintiff Hogan's claim, this Court wrote:

> Hogan's evidence tends to show that Pfeiffer [defendant's agent] screamed and shouted at her, called her names, interfered with her supervision of waitresses under her charge, and on one occasion threw menus at her. She also testified that she shouted back at Pfeiffer. This conduct lasted during the period from 22 June 1983 until her termination on 24 July 1983. The general manager, Clifford Smith, received complaints from both Hogan and Pfeiffer concerning the temper of the other. His

DANIEL v. CAROLINA SUNROCK CORP.

[110 N.C. App. 376 (1993)]

attempt to discuss the situation with both employees was unsuccessful because Pfeiffer walked out.

While we do not condone Pfeiffer's intemperate conduct, neither do we believe that his alleged acts "exceed all bounds usually tolerated by a decent society," *Stanback, supra,* so as to satisfy the first element of the tort, requiring a showing of "extreme and outrageous conduct." *Dickens, supra.*

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

> The liability clearly does not extend to mere insults, indignities, threats, . . . . The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind.

> There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. . . .

Restatement (Second) of Torts, §46 comment (d) (1965). We hold Pfeiffer's conduct, as shown by Hogan's forecast of evidence, was not such as to be reasonably regarded as "extreme and outrageous" so as to permit Hogan to recover for intentional infliction of mental distress.

In the case at bar, plaintiff's forecast of evidence, taken in the light most favorable to plaintiff, fails to demonstrate that the defendants' alleged actions "exceed all bounds usually tolerated by a decent society." Guided by the *Hogan* standards, we hold that defendants' alleged acts do not rise to the level of extreme and outrageous conduct, so as to support plaintiff's claim for intentional infliction of emotional distress. Accordingly, we affirm the trial court's granting of defendants' motion for summary judgment as to plaintiff's claim of intentional infliction of emotional distress.

For the reasons stated above, the trial court's order granting defendants' motion for summary judgment on plaintiff's wrongful discharge claim is reversed. The trial court's granting of defendants' summary judgment on plaintiff's claim for intentional infliction of emotional distress is affirmed.

Affirmed in part, reversed in part, and remanded.

Judge GREENE concurs.

Judge LEWIS dissents in a separate opinion.

Judge LEWIS dissenting.

I must respectfully dissent from the majority's opinion regarding the issue of wrongful discharge and I would vote to affirm the trial court's entry of summary judgment. I believe that the majority's opinion takes the public policy exception to the employment at will doctrine substantially beyond the rationale proclaimed in *Sides v. Duke University*, 74 N.C. App. 331, 328 S.E.2d 818, *disc. rev. denied*, 314 N.C. 331,. 335 S.E.2d 13 (1985) and *Williams v. Hillhaven Corp.*, 91 N.C. App. 35, 370 S.E.2d 423 (1988). In *Sides*, this Court first recognized the public policy exception when a nurse was discharged when she refused to commit perjury to protect her employer from liability in a civil suit. In reaching its decision, this Court said that encouraging perjury or incomplete testimony was an affront to our legal system. *Sides*, 74 N.C. App. at 338, 328 S.E.2d at 823-24. In *Williams*, we extended the public policy exception to a situation where an individual was harassed and eventually discharged after she testified truthfully. The *Williams* Court characterized the public policy exception as a "narrow exception" and again reaffirmed the rationale in *Sides* by stating: "[t]he law must encourage and not discourage truthful testimony." *Williams*, 91 N.C. App. at 40, 370 S.E.2d at 426, quoting *Petermann v. International Brotherhood of Teamsters*, 344 P.2d 25, 27 (Cal. App. 1959). This Court now seeks to extend the public policy exception to a situation where an employee was discharged for expressing a willingness to testify honestly, even though she was not called upon to do so. Although I agree with the majority that it is immaterial as to whether the plaintiff actually testified, I would still be compelled to say that even in the light most favorable to the plaintiff the facts of this case do not raise a genuine issue of material fact.

DANIEL v. CAROLINA SUNROCK CORP.

[110 N.C. App. 376 (1993)]

The majority concludes that "a reasonable finder of fact might draw the inference that Pfohl engineered plaintiff's discharge because he believed she was prepared to testify truthfully in the Gentry lawsuit." It is this conclusion with which I disagree. All of the evidence shows that it was plaintiff who sought out Pfohl once she was subpoenaed, and not the other way around. Pfohl told plaintiff that she would need to obey the subpoena and that she should tell the truth. Pfohl also told plaintiff that she was free to meet with Gentry's attorney. Nowhere in the record does any evidence appear that Pfohl or any of his employees encouraged plaintiff to commit perjury or to testify in a manner other than truthfully. Thereafter Pfohl never called plaintiff in nor even mentioned her testimony. I can hardly see how encouraging truthful testimony is an affront to our legal system and contrary to the public policy of this State.

The majority seems to rely heavily on the statement Pfohl made to plaintiff that she needed to remember for whom she worked and that she should say as little as possible. Plaintiff says that from this statement she felt threatened, and to the majority this seems to be enough to avoid summary judgment. However, if such innocuous statements as this are sufficient to support a claim for wrongful discharge, then employers will have to stand mute when faced with a similar situation for fear that no matter what they say their employees may perceive it as a threat. Surely an eggshell sensitivity of perception should not override the rule of reasonable application. Such a result would take the public policy exception too far, and what was characterized as a "narrow exception" to the employment at will doctrine will virtually swallow the rule.

I would also vote to affirm the trial court's entry of summary judgment on the basis that plaintiff has failed to demonstrate a sufficient causal connection between the actions of Pfohl and her discharge. Plaintiff received the subpoena in January of 1988. The Gentry lawsuit was settled in May of 1988 and it was not until June of 1989 that plaintiff was finally discharged. Thus seventeen months elapsed from the time plaintiff was subpoenaed until she was finally discharged. A full thirteen months transpired from the date the Gentry case was settled until plaintiff's discharge. In both *Sides* and *Williams*, the lapse of time was much less, with no more than three months transpiring between the truthful testimony of the employee and their termination, leaving no doubt a direct causal relationship existed. However, on the facts of this

DIST. BD. OF METRO. SEWERAGE DIST. v. BLUE RIDGE PLATING CO.

[110 N.C. App. 386 (1993)]

case, the lapse of at least thirteen months between the settlement of the Gentry case and plaintiff's discharge shows a complete lack of any causal connection, and precludes plaintiff's claim as a matter of law.

For the foregoing reasons I respectfully dissent and would vote to affirm the trial court on the issue of wrongful discharge.